G. H. A. KUNST, Judge.
From July, 1942, until the 28th day of November, 1942, employees of the state road commission, respondent herein, were employed in reflooring and painting what is called Neal Run Bridge, about two and one-half miles from Parkersburg in Wood county, West Virginia. This is a structure six hundred and twenty-seven feet long and twenty-one feet in width, with a roadway fifteen and one-half feet in width and a walkway five and one-half feet in width. It crosses Neal Run and connects and is a part of the state road system under the jurisdiction and control of respondent. The road at the western end of the bridge is called Camden avenue and there are several cross streets. This is a residential section, consisting of twelve or more houses. In the families living in this immediate locality, there were about thirty children; three small ones, *370 not sid juris, one five years of age, two about four, and one nine, and the rest considerably older, many of them attending high school.
When the repair work on the bridge was started, a “road closed” sign was placed on the north side of the pavement of the road approximately one-fourth of a mile west of the west end of the bridge and a similar sign similarly placed, at similar distance at the east end of the bridge. At each end of the bridge, across the roadway, a barricade about fourteen feet in length and about four and one-half feet in height, made by nailing three two by six inch boards to three braced upright, heavy, pieces. The first board was about eighteen inches from the ground and with spaces about eight inches or more between the boards. Boards were fastened across the walkway and affixed to the barricades were “road closed” signs. At night lighted torches were placed at each end of the bridge.
At the time of the accident herein mentioned the old flooring had all been removed, which left eight steel i beam girders five inches wide on top surface exposed, parallel and properly spaced extending the length of the bridge and upon which the new floor was being placed and which now extended from the east end of the bridge to within approximately one hundred and sixty feet of the west end. Pedestrians had placed a two by twelve inch board across the stream and when the water was not over the board, or the banks were not excessively slippery and muddy, were using this as. a substitute for the bridge in crossing the stream. But when water covered the board, they, men and women, used the bridge in its unfloored condition and it was also used by school children, when the board of education stopped bus service and required school children within two miles of school houses to walk. Men working on the bridge carried books and other equipment for them and assisted children across. Boys riding bicycles had crossed by walking on the flange of one girder and running the bicycle on another. A great many people, adults and children crossed the bridge during the long period it was unfloored. Some boards were laid upon the i beams for work *371 men in walking and carrying boards but part of it was apparently not covered and timid persons would hold to the railing on side of bridge and walk on the flange of girder to the re-floored portion of bridge.
Mrs. Agnes Marie Sims, a widow, forty years of age, who made a living by washing and paper hanging and with state aid for her little girl, with her family consisting of a boy fifteen years of age, named Brooks Lagnor, whom she had reared from a child; a daughter two years of age, and a boy Everett Brady Sims about four and one-half years of age, and Harry Sims, a boarder, a cousin of her deceased husband, lived in a house on Camden avenue about six hundred and fifty feet from the west end of the bridge.
At about 12:40 o’clock, p.. m. of the 28th day of November, 1942, she permitted her son, Brady, to go out in the back yard to play. This back yard opened onto Camden avenue. At about one twenty o’clock p. m., Cleto Janutolo, foreman, William Miller and Raymond Beal, employees, of respondent went to the west end of the bridge to find the right sized board to fit in flooring. Two small boys were playing on the concrete near the barrier at the west end of the bridge. Having examined some boards piled on one side, at the end of the bridge, they were returning without the board when about one hundred and forty feet from the west end of bridge they heard a noise like a board striking the ground below the bridge. Miller went to investigate. He found that the small Sims boy, Brady, had fallen from the bridge, a distance of about twenty feet on broken concrete chunks in the creek bed. Beal went to a house to telephone for an ambulance. Miller carried the child to the home of Mrs. Chester Smith, a short distance from the bridge. He was fatally hurt, still living, but unconscious. Mrs. Smith bathed his face and when the ambulance came he was taken to Camden hospital and died about an hour later.
Mrs. Sims, his administratrix, alleging negligente of the state road commission, respondent, caused his death, asks an award of $10,000.00 from this court.
*372 The extent of danger incident to the use by pedestrians of this unfloored bridge at the western end is not well shown by the evidence, the nature and condition of ground, under same, its slope and distance from bridge girders can only be approximated. Witness Miller says: “It is low on the ground.” At about eighty feet from the west end, the place where Brady Sims fell, the top of girders were about twenty feet from the ground. Witness Cottle stated that: “The ground level sloped down from the west abutment fairly flat.”
That this unfloored bridge was not a dangerous factor, instrumentality or agency, such as gasoline, electricity, dynamite, powder, or other explosives and respondent and its employees did not owe to trespassing young children the high degree of care which is required in the possession and storage of such articles, and the law applicable in such cases, cited in brief for claimant, is not applicable here. What danger existed was patent, not latent; it constituted no trap, no pitfall, no lurking danger, no danger that could not be seen and appreciated by all persons sui juris — and so far as the evidence shows not trespassed upon in any way by anyone, not sui juris, except by the unfortunate youngster, Brady Sims.
The bridge had, by the action of respondent in placing barriers and notices of the road being closed and lighted by torches at night, ceased to be in use for all vehicular and pedestrian travel and fully informed all sui juris persons of that fact, and the evidence shows that it was so known by them, and any use by them of it constituted them as trespassers. There was no tacit consent, no passive acquiesence by the employees of respondent, no toleration of the trespass by children that could be interpreted into an inference of permission — -it seemingly being the element that distinguishes the licensee from the trespasser. Evidence of claimant’s own witnesses shows: That the workmen on the bridge had warned each one of the children in the vicinity to stay away from the bridge; that it was their custom and repeated practice to tell them not to go upon it and to drive and put them off; that Mr. Sprouse’s grandson, one of the three non juris children mentioned, was *373 not allowed near the bridge; that Jesse Wilson would not allow his children to play around the bridge; that Mrs. Smith’s little girl and her sister’s little girl, when she and her sister came to play with other children in Mrs. Smith’s basement and yard and on the concrete at the end of the bridge, were never unattended and were always in the care of older children.
It is not shown that the bridge with its girders exposed was used as a playground, or that it could have been so used, and little danger is shown by boys climbing in and out and over the barrier at the end of bridge, that the basement and the yard of Mrs. Smith near the bridge and the concrete at the west end of the bridge was not a regular playground but there was only a casual and intermittent use of these premises for play by neighborhood children. The evidence does not show that the boys who sat on the end of the steel girders when the workmen had left the bridge were in any danger, so far as the evidence discloses their feet could have been on the ground.
Much emphaasis is placed by counsel for claimant on the fact that the barrier at the west end of bridge did not sufficiently safeguard the danger of this unfloored bridge from the trespassing of young children and that a high, wide and solidly built barrier should have fenced the opening on the west end of bridge and that a guard should have been placed there. The evidence shows that had this barrier been of solid structure. extending the full height and width of the bridge and along its sides, it would have still been possible for children to get upon the bridge by going down to the run and coming up under the bridge to climb upon the i beam girders at the end. or by climbing up a ladder over the top.
Courts have held that it is not required that premises should be “... child proof....” 45 Corpus Juris 782., and cases there cited. “But to hold that the fence must have been such that a boy could not climb over it, would be to impose upon defendant the duty of extraordinary care and the liability of an *374 insurer, and no court has yet extended the rule further than to require ordinary precautions to prevent injury in such cases,. ..” McLendon v. Hampton Cotton Mills, 109 S. C. 238, 243, 95 S. E. 781. The .courts have well said that no one yet has been able to build a fence which a boy cannot surmount. The law is that although these children Billy Lowery and Brady Sims had no legal right to go upon this bridge and were therefore trespassers, the fact that Brady Sims was a child of tender years did not alter the rule governing the rights of trespassers and because he was an infant of tender years did not raise a duty where none otherwise existed.
Respondent’s duty to him as such trespasser was not to wantonly injure him, but respondent, as the evidence shows before and at the time when this sad happening occurred, gave to him the same care as if its duty had been to an invitee; five men fully instructed to keep children off the bridge, and constantly and repeatedly carrying out this instruction were working on this bridge and some one of them did drive these two boys from the bridge, taking hold of them to do so, immediately before the child, Brady Sims, fell through the bridge.
There is no evidence that respondent or its workmen had knowledge of or could have anticipated the presence of this child upon the bridge at this time, consequently no negligence appears on the part of respondent, and an award is refused and the case dismissed.